502 S.E.2d 63

**The STATE, Respondent,**

**v.**

**Joseph KELSEY, Appellant.**

**No. 24801.**

Supreme Court of South Carolina.

Heard Feb. 4, 1998.
Decided June 8, 1998.
Rehearing Denied July 20, 1998.

54

Senior Assistant Appellate Defender Wanda H. Haile, South Carolina Office of Appellate Defense, Columbia, for appellant.

Attorney General Charles Molony Condon, Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, Senior Assistant Attorney General William Edgar Salter, III, Assistant Attorney General Robert F. Daley, Jr., Columbia; and Solicitor Donald V. Myers, Lexington, for respondent.

TOAL, Acting Chief Justice:

This case involves the murder of fifteen-year-old Melanie Richey. Joseph Kelsey and Geoffrey Payne were tried together and convicted of Richey's murder. Kelsey appeals his conviction. We affirm.

## FACTUAL/PROCEDURAL BACKGROUND

In early July 1994, sixteen-year-old Kelsey was staying with his friend, seventeen-year-old Mike Kirchner in Martinez, Georgia. On Monday, July 11, 1994, Kirchner left to go to work, leaving Kelsey, seventeen-year-old Geoffrey Payne, and seventeen-year-old Jamie Lynn Lee ("Defendants") alone in the house. Defendants decided to manufacture homemade pipe bombs. They initially constructed a bomb using copper tubing and gun powder extracted from firecrackers. They detonated the bomb near a tree in Kirchner's backyard.

Defendants then decided to construct more sophisticated pipe bombs. To accomplish this, they shoplifted pipe material and shotgun shells from a nearby hardware store and Wal-Mart. Under the direction of Kelsey, they built three galvanized steel pipe bombs, one of which they detonated in Kirchner's backyard. The explosion produced a crater approximately four inches deep and one foot wide. It left bomb fragments in the side of Kirchner's house and in a nearby privacy fence. Kelsey placed the other two unexploded bombs in his travel bag inside Kirchner's house.

Later that evening, Defendants gathered at Kirchner's house for a party. In addition to Defendants, the following individuals showed up for the party: Tom Wurtzinger, April Reese, Tommy Speigel, and Joey Ingram. Everyone was drinking beer. At around midnight, Lee and Payne left the party to go to a nearby Texaco station, a popular "hang-out" area among local teens. When Lee and Payne arrived at the station, they spotted Melanie Richey standing near a telephone booth. They noticed something was wrong with her foot. In the process of sneaking out of her house to meet with a friend, Richey had severely cut her foot. Lee and Payne offered to take Richey to Kirchner's house in order to clean and bandage her injuries. Richey accepted.

Lee, Payne, and Richey returned to Kirchner's house at around 1:30 a.m. Lee and Payne helped Richey bandage her foot and then all three rejoined the party. Soon thereafter, Payne and Richey went outside on Kirchner's back porch where Payne repeatedly tried to coax Richey into having sexual intercourse with him. Richey refused Payne's advances. At several points during the night, Payne expressed to Lee his frustration over Richey's intransigence. Kelsey testified that at one point he overheard Payne tell Lee that he was so mad he could kill Richey.

Payne instructed Lee to crush up a tablet of "Ecstacy," a mild hallucinogen. Payne poured the powder into a mixture of tea and water in order to hide the taste of the drug. Payne gave the drink to Richey and told her it would help calm a stomach-ache she had been complaining about earlier in the evening. Payne did not tell her that the drink was laced with Ecstacy. Kelsey testified that while this was going on, he was resting on the floor by the stereo and occasionally changing the music selection.

At around 3:30 a.m., Defendants decided to take Richey home. While Richey was waiting for Defendants outside of Kirchner's house, Payne asked Lee to get something to knock Richey out with. Lee retrieved a wrench from Kirchner's garage. Payne then suggested that Kelsey bring the unexploded pipe bombs. Kelsey complied by retrieving the bombs from his travel bag. Kelsey testified that he was unaware, at the time, of what Payne actually intended to do with the wrench and bombs.[1]

Defendants and Richey then got into Lee's car, ostensibly to take Richey home. Lee was driving, Kelsey was in the passenger seat, and Payne and Richey were in the backseat. Although Richey had given them directions to her house, Lee detoured in the opposite direction. Richey asked where they were going; Payne replied that they were going to drive around for a while. Lee eventually drove across the Georgia border and into South Carolina. Lee testified that the music

---

1. Kelsey testified that he assumed Payne wanted to blow up mail boxes with the pipe bombs. As for the wrench, he thought Payne wanted to steal a car bumper to give to Kirchner's girlfriend because her bumper had been damaged earlier in a wreck with Lee's car.

was "obscenely" loud in the car, and he was going about 90 m.p.h.

Soon after entering South Carolina, Lee noticed his tachometer go from 4200 to 6000 r.p.m. Lee looked down at the gear shift and discovered Richey's foot had knocked the gear into neutral. Lee turned around and saw that Payne had Richey in a "strangle hold type position." Lee continued to drive. A few minutes later, Lee "heard two quick, empty thud type sounds." He again turned around and saw that Payne still had Richey in a strangle hold. Lee further testified that Payne had the wrench in his hand. Kelsey testified that he had also turned around and saw that Richey's body was limp, her face was pale, and her lips were blue.

A few moments later, Payne leaned forward to tell Lee to turn the music down. According to Lee's testimony, Payne stated, "I'm pretty sure she's knocked out, guys." Payne then instructed Lee to go to "Scary Bridge" which crossed over Stevens Creek, the boundary line between Edgefield and McCormick counties. Lee drove to the bridge where he parked the car.

Defendants got out of the car, leaving Richey in the backseat. Payne informed Lee and Kelsey that he was going to have sex with Richey. Payne took off his clothes and Richey's shorts. A few moments later, Lee warned Payne that a car was coming. Defendants quickly got back into Lee's car and began driving. After the approaching vehicle passed, Lee turned the car around and went back to the bridge. Lee testified that Richey was unconscious the entire time, and "she was definitely alive." Kelsey, on the other hand, testified that he had checked Richey's pulse, and he believed she was dead.

Lee once again drove away from the bridge. He got approximately 100 feet down the road when Payne told him to stop the car. Defendants pulled Richey out of the car and carried her into the woods and up an embankment where they placed her on the ground. Lee returned to the car. Payne and Kelsey remained by Richey's body.

Kelsey testified that while he was standing over Richey's body, Payne instructed him to place a pipe bomb into Richey's mouth. Kelsey complied. Payne then lit the fuse, and the

two ran. A few seconds later, the bomb exploded. Defendants returned to Kirchner's house where they fell asleep.

Defendants were eventually arrested and charged with Richey's murder. Kelsey was arrested in Maryland and brought back to South Carolina to stand trial. Kelsey's case was transferred from family court to the Court of General Sessions where Kelsey and Payne were tried together as adults. Payne was found guilty of murder and criminal conspiracy. Kelsey was found guilty of murder, possession of a pipe bomb, and criminal conspiracy. Kelsey was sentenced to life imprisonment for murder and consecutive sentences of five years for possession of a pipe bomb and criminal conspiracy.

Kelsey appeals his conviction, raising the following issues:

(1) Did the trial court err in denying Kelsey's directed verdict motions because there was insufficient proof that Kelsey was guilty of murder and criminal conspiracy?

(2) Did the family court err in transferring jurisdiction over Kelsey's case to the Court of General Sessions?

(3) Did the trial court err in denying Kelsey's motion for a change of venue?

(4) Did the trial court err in failing to declare a mistrial when Payne's attorney pitted Kelsey's testimony against a police officer's testimony?

(5) Did the trial court err in not allowing testimony and introduction of evidence to rebut the State's innuendos that Kelsey's statement was not given in earnest?

(6) Did the trial court err in precluding Kelsey from introducing Payne's statement into evidence?

(7) Did the trial court err in not allowing Kelsey to admit evidence regarding codefendant Payne?

(8) Did the trial court err in denying Kelsey's motion for severance?

(9) Did the trial court err in denying Kelsey's motion for a mistrial when Payne's attorney cross-examined Kelsey about prior bad acts that allegedly occurred in Georgia?

(10) Did the trial court err in admitting a diagram and photographs of the crime scene into evidence?

(11) Did the trial court err in failing to give proper conspiracy and mere presence instructions?

(12) Did the trial court err in refusing to charge the jury on the law of mistake of fact?

## LAW/ANALYSIS

## I. DIRECTED VERDICT MOTIONS

Kelsey argues that the trial court erred in denying his directed verdict motions because there was insufficient proof that he was guilty of murder and criminal conspiracy. We disagree.

At the close of the State's case in chief, the defense moved for directed verdicts on the murder and conspiracy charges, arguing the evidence was insufficient to support these charges. The court denied the motions. The defense again moved for directed verdicts on murder and conspiracy at the end of its case. The court again denied the motions.

In reviewing the denial of a motion for a directed verdict, the evidence must be viewed in the light most favorable to the State, and if there is any direct evidence or any substantial circumstantial evidence reasonably tending to prove the guilt of the accused, an appellate court must find that the case was properly submitted to the jury. *State v. Rowell,* 326 S.C. 313, 487 S.E.2d 185 (1997); *State v. Venters,* 300 S.C. 260, 387 S.E.2d 270 (1990); *State v. Edwards,* 298 S.C. 272, 379 S.E.2d 888 (1989). In ruling on a motion for a directed verdict, the trial court is concerned with the existence of evidence, not its weight. *State v. Williams,* 303 S.C. 274, 400 S.E.2d 131 (1991).

### A. MURDER

Murder is "the killing of any person with malice aforethought, either express or implied." S.C.Code Ann. § 16–3–10 (1985). "Malice" is the wrongful intent to injure another and indicates a wicked or depraved spirit intent on doing wrong. *State v. Johnson,* 291 S.C. 127, 352 S.E.2d 480 (1987). Malice may be implied from the defendant's use of a deadly weapon. *State v. Campbell,* 287 S.C. 377, 339 S.E.2d 109 (1985).

In the instant case, we find there was sufficient evidence to submit the murder charge to the jury. The following evidence supports our conclusion:

(1) Lee's testimony that Kelsey essentially masterminded the construction of the pipe bombs at Kirchner's house on July 11; that Kelsey and Payne were alone together in the woods with Richey's body; that Lee believed Richey was definitely alive, but unconscious, while in the car; and that Kelsey and Payne were running out of the woods away from Richey's body when the pipe bomb exploded;

(2) SLED agent Joseph Powell's testimony that metal fragments found at the crime scene matched fragments found at Kirchner's house;

(3) the forensic pathologist's testimony that the explosion was the more probable cause of death;

(4) April Reese's and Tom Wurtzinger's testimony corroborating Lee's statements concerning the events that took place at Kirchner's house on July 11 & 12; and

(5) Kelsey's admission that he was the one who placed the pipe bomb into Richey's mouth.

Therefore, when the evidence is viewed in the light most favorable to the State, the trial court correctly denied Kelsey's motion for a directed verdict on the murder charge.[2]

### B. CONSPIRACY

Conspiracy is defined as the "combination between two or more persons for the purpose of accomplishing a criminal or unlawful object or an object neither criminal nor unlawful by criminal or unlawful means." S.C.Code Ann. § 16–17–410 (1985). To establish the existence of a conspiracy, proof of an express agreement is not necessary, and direct evidence is not essential, but the conspiracy may be sufficiently shown by circumstantial evidence and the conduct of the parties. *State v. Fleming*, 243 S.C. 265, 133 S.E.2d 800 (1963). In *State v. Childs*, 299 S.C. 471, 385 S.E.2d 839 (1989), the defendant

---

**2.** Kelsey also argues that he should be exonerated because there was evidence supporting the defense of duress. However, in South Carolina, duress is not a defense to murder. *State v. Rocheville*, 310 S.C. 20, 425 S.E.2d 32 (1993).

argued that the trial court erred in denying his motion for a directed verdict on a conspiracy charge. We disagreed, finding that the following facts tended to prove the defendant's guilt: evidence that defendant knew codefendant; defendant was seen running from the area where the victim's body was found; bloodhounds had tracked the victim's scent to the codefendant's house; and defendant had given a written statement stating that he agreed to be a lookout for codefendant.

▇ In this case, evidence indicated that Kelsey was instrumental in constructing the pipe bombs at Kirchner's house; that Kelsey was with Lee and Payne on the night of the murder; that Kelsey helped Payne carry Richey into the woods; that Kelsey and Payne were alone together in the woods with Richey's body; and that Kelsey placed the pipe bomb into Richey's mouth. We therefore find the evidence was sufficient to submit the conspiracy charge to the jury.

## II. TRANSFER OF JURISDICTION

Kelsey argues that the family court erred in transferring jurisdiction over his case to the Court of General Sessions. We disagree.

In making its motion to transfer jurisdiction, the State relied on S.C.Code Ann. § 20–7–430(4) & (6) (1985). Section 20–7–430(4) provides that the family court may transfer jurisdiction if that court finds "it contrary to the best interest of such child or of the public to retain jurisdiction." [3] After conducting a hearing on the State's transfer motion, the family court ordered jurisdiction over Kelsey's case be transferred to the Court of General Sessions. The family court found it was in the best interest of Kelsey and the community to have Kelsey tried as an adult. The family court's findings were

---

3. Section 20–7–430(4) provides, in full:

If a child sixteen years of age or older is charged with an offense which would be a misdemeanor or felony if committed by an adult and if the court, after full investigation, deems it contrary to the best interest of such child or of the public to retain jurisdiction, the court may, in its discretion, acting as committing magistrate, bind over such child for proper criminal proceedings to any court which would have trial jurisdiction of such offense if committed by an adult.

based primarily upon criteria established in the appendix to the United States Supreme Court case of *Kent v. United States,* 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966).[4]

It is the responsibility of the family court to include in its waiver of jurisdiction order a sufficient statement of reasons for, and considerations leading to, that decision. Conclusory statements, or a mere recitation of statutory requirements, without further explanation will not suffice. *In re Sullivan,* 274 S.C. 544, 265 S.E.2d 527 (1980). The serious nature of the offense is a major factor in the transfer decision. *See Sanders v. State,* 281 S.C. 53, 314 S.E.2d 319 (1984) (transfer upheld where defendant was charged with two counts of murder and two counts of assault and battery with intent to kill); *State v. Wright,* 269 S.C. 414, 237 S.E.2d 764 (1977)(transfer upheld where defendants were charged with armed robbery and assault and battery with intent to kill).

---

**4.** In *Kent,* the Court established the following criteria for determining whether jurisdiction should be waived under the District of Columbia Juvenile Court Act:

(1) The seriousness of the alleged offense to the community and whether the protection of the community requires waiver.

(2) Whether the alleged offense was committed in an aggressive, violent, premeditated, or willful manner.

(3) Whether the alleged offense was against persons or against property, greater weight being given to offenses against persons especially if personal injury resulted.

(4) The prosecutive merit of the complaint, i.e., whether there is evidence upon which a Grand Jury may be expected to return an indictment (to be determined by consultation with the United States Attorney).

(5) The desirability of trial and disposition of the entire offense in one court when the juvenile's associates in the alleged offense are adults who will be charged with a crime in the U.S. District Court for the District of Columbia.

(6) The sophistication and maturity of the juvenile as determined by consideration of his home, environmental situation, emotional attitude and pattern of living.

(7) The record and previous history of the juvenile, including previous contacts with the Youth Aid Division, other law enforcement agencies, juvenile courts and other jurisdictions, prior periods of probation to this Court, or prior commitments to juvenile institutions.

(8) The prospects for adequate protection of the public and the likelihood of reasonable rehabilitation of the juvenile (if he is found to have committed the alleged offense) by the use of procedures, services and facilities currently available to the Juvenile Court.

 In this case, the family court's transfer hearing was extensive. It not only included the testimony of relevant witnesses, including Kelsey, but also the submission of a lengthy preadjudicatory transfer evaluation. Additionally, the family court's transfer order was detailed and raised the following points: (1) Kelsey was charged with the serious and violent offense of murder, and the victim was a young girl; (2) it was likely that the Grand Jury would return an indictment against Kelsey; (3) Kelsey's two codefendant's were going to be tried in the Court of General Sessions; (4) if tried as a minor, Kelsey would only get 24 to 54 months if convicted of the murder charge—this was not in the community's best interest due to the seriousness of the crime; and (5) Kelsey would have less of a chance of rehabilitation in the juvenile justice system because his sentence under that system would be brief.

We therefore find the family court properly transferred jurisdiction to the Court of General Sessions pursuant to section 20–7–430.[5]

### III. CHANGE OF VENUE

 Kelsey argues that the trial court erred in denying his motion for change of venue due to the enormous amount of pretrial publicity surrounding his case. We disagree.

During voir dire, the trial judge asked all of the prospective jurors whether they had heard anything about the case through the news media. Of the ninety prospective jurors, seventy-nine indicated that they had heard something about the case. The trial judge then asked these prospective jurors whether they could put aside what they had heard and base their verdict on the evidence presented at trial. Thirty-five indicated that they could not and were consequently excused by the trial judge. The trial judge further questioned three of the remaining jurors after defense counsel expressed concern about their initial responses. After voir dire was completed, the defense renewed its motion for a change of venue. The trial judge denied the motion, stating:

---

5. Section 20–7–430 was repealed by 1996 Act No. 383, § 2, effective July 1, 1996.

My sound instinct though tells me that just because these people have heard about the case doesn't have to necessarily mean that they have formed some opinion about the case. To do that I think would have to, in essence, assume that they believed everything they had seen or read and that, in essence, they were some sort of automatons that were dictated to by the news media. I don't think I can go that far.

Of the twelve jurors finally seated, three had not heard anything about the case.

Kelsey argues that the media attention surrounding his case was so great that it precluded any possibility of him obtaining a fair trial by an impartial jury as guaranteed by the Sixth Amendment to the United States Constitution. Kelsey further argues that this prejudice is demonstrated by the fact that such a high number of prospective jurors indicated, during voir dire, that they had heard something about the case. Kelsey suggests that all of the prospective jurors not excused during voir dire were in some way subconsciously affected by the high volume of media coverage surrounding the case.

 A motion for a change of venue is addressed to the sound discretion of the trial judge and will not be disturbed absent an abuse of discretion. *State v. Caldwell,* 300 S.C. 494, 388 S.E.2d 816 (1990). When the trial judge bases his ruling upon an adequate voir dire examination of the jurors, his conclusion that the objectivity of the jury panel has not been polluted by outside influence will not be disturbed absent extraordinary circumstances. *State v. Patterson,* 324 S.C. 5, 482 S.E.2d 760 (1997); *State v. Caldwell,* 300 S.C. 494, 388 S.E.2d 816; *State v. Thompson,* 278 S.C. 1, 292 S.E.2d 581 (1982), *overruled on other grounds by State v. Torrence,* 305 S.C. 45, 406 S.E.2d 315 (1991). Mere exposure to pretrial publicity does not automatically disqualify a prospective juror. *State v. Caldwell,* 300 S.C. 494, 388 S.E.2d 816. When jurors have been exposed to such publicity, a denial of a change of venue is not error where jurors are found to have the ability to lay aside any impressions or opinions and render a verdict based on the evidence presented at trial. *Id.* Moreover, it is the defendant's burden to demonstrate actual juror prejudice

as a result of news accounts of the defendant's case. *State v. Owens*, 293 S.C. 161, 359 S.E.2d 275 (1987).

Kelsey cites *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961) and *Patton v. Yount*, 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984), for the proposition that pretrial publicity may be so severe as to create a presumption of prejudice in the community, and therefore, make it impossible for the defendant to receive a fair trial. However, in *Dowd*, the Court stated there was no requirement that jurors be totally ignorant of the facts and issues involved in the case. "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Dowd*, 366 U.S. at 723, 81 S.Ct. at 1643, 6 L.Ed.2d at 756. The Court in *Dowd* ultimately concluded that the pretrial publicity was unduly prejudicial to the defendant because eight of the twelve jurors finally placed in the jury box expressed, during voir dire, their belief that the defendant was in fact guilty.[6]

In the instant case, there was no indication that any of the jurors finally seated had formed a pretrial opinion that Kelsey was guilty. Nine of the twelve jurors admitted they had been exposed to some pretrial media coverage, but they told the trial judge they could put aside what they had heard and render a verdict based on the evidence presented at trial.

 "[A defendant's] mere assertion that the jurors could have been subconsciously affected by ... media exposure is insufficient to show prejudice." *State v. Owens*, 293 S.C. at 167, 359 S.E.2d at 278. Kelsey has not gone beyond this mere assertion to show actual prejudice in his case. Although media coverage was widespread and intense before Kelsey's trial, there was no indication that the trial court's voir dire failed to produce an impartial jury.

---

6. In *Dowd*, the pretrial news coverage was extremely intense and negative toward the defendant. The coverage included details of the defendant's background, including references to crimes he committed when he was a juvenile, convictions for arson almost 20 years previously, and burglary and AWOL court-martial charges. The news media further accused him of being a parole violator, announced his police line-up identification, his confession to the six murders, and his offer to plead guilty. *Dowd*, 366 U.S. at 725, 81 S.Ct. at 1644.

## IV. PITTING OF WITNESS

 Kelsey argues that the trial court erred in failing to declare a mistrial when Payne's attorney attempted to pit Kelsey's testimony against a police officer's testimony. We disagree.

Kelsey was arrested by officer Slavin in Maryland. At trial, Slavin testified that when Kelsey was detained in his police car, Kelsey asked if he was going to be treated as an adult or juvenile. Slavin told him he would be treated as an adult. Slavin then testified, "[Kelsey] wanted to know why because he said he was a juvenile when he did it." The State also introduced into evidence a copy of Slavin's incident report to corroborate his testimony.

During Payne's cross-examination of Kelsey, the following exchange occurred:

Q. Have you read that document [Slavin's incident report] you just denied ever seeing?

A. I have never read through this document.

Q. You have never seen anything like that?

A. No, sir.

Q. Anyone who says you have would, of course, be mistaken or lying; is that correct?

Kelsey's attorney immediately objected, arguing the question improperly pitted Kelsey's testimony against Slavin's testimony. Kelsey moved for a mistrial. The trial judge sustained Kelsey's objection, but denied his motion for a mistrial. Payne's counsel continued with the cross-examination of Kelsey:

Q. So when [Slavin] said that you said, "I was juvenile when I did it," Mr. Slavin was incorrect?

A. Yes, sir, he was.

Kelsey again objected on the same grounds as before. The trial judge sustained the objection but denied Kelsey's motion for a mistrial.

 The decision to grant or deny a mistrial is within the sound discretion of the trial judge and will not be overturned on appeal absent an abuse of discretion. *State v. Crim,* 327 S.C. 254, 489 S.E.2d 478 (1997); *State v. Dawkins,*

297 S.C. 386, 377 S.E.2d 298 (1989). The power of the court to declare a mistrial ought to be used with the greatest caution and for plain and obvious causes stated into the record by the trial judge. *State v. Dawkins,* 297 S.C. 386, 377 S.E.2d 298. The granting of a motion for a mistrial is an extreme measure which should be taken only where an incident is so grievous that prejudicial effect can be removed in no other way. 75B Am.Jur.2d Trial § 1706 at 491 (1992).

We first note that any prejudice to Kelsey could have been removed by the trial court striking the testimony and giving a curative instruction to the jury. *See State v. Simpson,* 325 S.C. 37, 479 S.E.2d 57 (1996)(an instruction to disregard incompetent evidence usually is deemed to have cured the error in its admission unless on the facts of the particular case it is probable that notwithstanding such instruction or withdrawal the accused was prejudiced). However, Kelsey's attorney failed to make such a motion before the trial court. *See* 75 Am.Jur.2d *Trial* § 467 at 642 (a motion for mistrial does not automatically include a motion to strike as a lessor prayer for relief).

▌ Nonetheless, we find that Kelsey was not unfairly prejudiced by the testimony. Although it is improper for an attorney to cross-examine a witness in such a manner as to force him to attack the veracity of another witness, improper "pitting" constitutes reversible error only if the accused was unfairly prejudiced. *State v. Sapps,* 295 S.C. 484, 369 S.E.2d 145 (1988). While Kelsey's credibility was at issue in the case, Kelsey admitted on direct examination that he had, in fact, placed the pipe bomb into Richey's mouth. The critical issue for the jury to decide was whether Richey was alive or dead when Kelsey committed this act. The above colloquy between Kelsey and Payne's attorney did not directly relate to this issue. Kelsey merely disputed telling Officer Slavin that he was a juvenile when he "did it." Any prejudice to Kelsey was minimal and does not warrant reversal.

## V. PRIOR STATEMENTS

▌ Kelsey argues that the trial court erred in denying his right to introduce a prior statement in order to defend against

the State's allegation that he testified untruthfully during his testimony before the jury. We disagree.

During the State's cross-examination of Kelsey, the solicitor emphasized that Kelsey's trial testimony was inconsistent with testimony he had given at the December 5, 1994 family court waiver hearing and with statements he had given to SLED agent Dan Choate on September 29, 1994. In response, Kelsey called Choate to the stand and attempted to elicit testimony from him concerning Kelsey's prior September statement. The State objected, arguing the defense was trying to introduce a prior *consistent* statement which was impermissible under Rule 801(d)(1), SCRE. Kelsey's attorney responded, arguing that he was entitled to have the entire inconsistent statement introduced so that it could be viewed in context. The trial judge sustained the State's objection. Kelsey did not proffer any of the excluded testimony.

■ Generally, where a portion of a witness's prior inconsistent statement has been introduced to impeach that witness, the entire statement is admissible in rebuttal to explain the inconsistency. *See* 98 C.J.S. *Witnesses* § 622 at 636 (1957); Wigmore On Evidence § 1045 (Chadbourn rev. 1970). However, the mere mention of a conversation or statement does not automatically entitle the opponent to bring out the other parts. Remaining portions which are not relevant or material in the explanation of the inconsistency are not admissible. *See People v. Cowper*, 145 Ill.App.3d 1074, 99 Ill.Dec. 868, 496 N.E.2d 729 (1986); *State v. Eugenio*, 210 Wis.2d 348, 565 N.W.2d 798 (Ct.App.1997); 98 C.J.S. *Witnesses* § 622 at 637. The trial court has broad discretion in determining whether to admit such evidence. *See State v. Daly*, 798 S.W.2d 725 (Mo.Ct.App.1990).

At trial, the solicitor asked Kelsey if Richey's mouth was bleeding inside the car. Kelsey responded that there was a small trace of blood on Richey's mouth. The following colloquy then took place between Kelsey and the solicitor:

Q. Mr. Choate over here. You had a conversation with Mr. Choate and your lawyer was there?

A. Yes, sir.

Q. Do you remember Mr. Choate said, "Mr. Kelsey, was there any blood on Melanie or anywhere in that car?" You said, "No, sir, it wasn't." Didn't you?

A. I don't remember that brief conversation. I mean. I tried to write down exactly what we talked about right afterwards. I said we had a brief conversation before and that then they gave me the forms and I wrote it down.

At trial, Kelsey's attorney argued that Kelsey had a right to have the entire statement introduced so that it could be viewed in context. However, there was no attempt to explain why the other portions of the September statement were relevant or material in explaining the inconsistency. Additionally, Kelsey failed to proffer any of the excluded testimony. *See State v. Anderson*, 304 S.C. 551, 406 S.E.2d 152 (1991) (where no proffer of excluded testimony is made, the Court is unable to determine whether the appellant was prejudiced by the trial judge's refusal to admit the testimony into evidence). We therefore find that the trial court did not abuse its discretion in sustaining the State's objection.

## VI. CODEFENDANT'S STATEMENTS

At trial, Kelsey's attorney called F.B.I. agent Harold Harrison to the stand to testify. Kelsey sought to elicit testimony from Harrison concerning statements Payne made to the F.B.I. during its investigation of Richey's death. Payne's attorney objected, arguing Payne's credibility could not be impeached unless Payne took the stand. Kelsey's attorney responded, stating that the purpose of the testimony was to rebut Payne's theory that Kelsey had co-opted Payne's statement and made it his own. Kelsey made an *in camera* proffer of the testimony. The proffer revealed that the interview did not contain any admission of guilt by Payne, but did discuss the sequence of events surrounding the crime. The trial judge sustained the objection, stating that Payne might still present a defense.

Even if Payne's statements were relevant as rebuttal evidence, Kelsey was not prejudiced by the trial judge's ruling. Lee had already testified that Payne fabricated his story and had instructed Lee to "flip everything around" and tell the

authorities that Kelsey killed Richey if questioned. Moreover, Lee's story at trial was more consistent with Kelsey's version of events than with Payne's. Thus, even if Payne's statements were relevant, they were, at best, needless presentation of cumulative evidence. *See* Rule 403, SCRE.

## VII. CODEFENDANT'S PHYSICAL APPEARANCE

 Kelsey argues that the trial court erred in not allowing him to present evidence concerning Payne's altered appearance at trial. We disagree.

At trial, Kelsey called Mae Guin, a guidance counselor from Payne's former high school. Kelsey's attorney attempted to question Guin about Payne's changed appearance since high school. Payne's attorney objected, arguing Payne's altered appearance was irrelevant. Kelsey argued that Payne's appearance at trial was an attempt to give the impression that he was something he was not. The trial judge sustained Payne's objection and gave a curative instruction to the jury.

Evidence regarding the physical condition of a party is admissible if relevant to an issue in the case. 29 Am.Jur.2d *Evidence* § 560 at 627. The only ground offered by Kelsey to support the introduction of Guin's testimony was that Payne was trying be something he was not. Payne's appearance was in no other way relevant to the case. We hold that the prejudicial effect of such evidence substantially outweighed any probative value it may have had. *See* Rule 403, SCRE. Thus, it was properly excluded.

## VIII. SEVERANCE

 Kelsey argues that the trial court erred in denying his motion for severance in the case. We disagree.

Before trial, Payne's attorney moved to have separate trials. Kelsey did not join in the motion. The trial judge denied Payne's motion. After the defense rested its case, Kelsey's attorney moved for a mistrial and argued that Kelsey was entitled to a severance. The trial judge denied the motion.

 In South Carolina, criminal defendants who are jointly tried for murder are not entitled to separate trials as a matter of right. *State v. Holland*, 261 S.C. 488, 201 S.E.2d

118 (1973); *State v. Crowe*, 258 S.C. 258, 188 S.E.2d 379 (1972). Motions for a severance and separate trial are addressed to the discretion of the trial court. *State v. Nichols*, 325 S.C. 111, 481 S.E.2d 118 (1997); *State v. Chaffee*, 285 S.C. 21, 328 S.E.2d 464 (1984), *overruled on other grounds by State v. Torrence*, 305 S.C. 45, 406 S.E.2d 315 (1991). Absent a showing of an abuse of discretion, this Court will not disturb the trial court's ruling on appeal. *State v. Thompson*, 279 S.C. 405, 308 S.E.2d 364 (1983).

Kelsey argues that severance should have been granted based on the prejudice discussed in issues 5, 6, and 7 of this appeal. As discussed above, Kelsey was not unfairly prejudiced by any of the trial court's rulings discussed in issues 5, 6, and 7, nor was he unfairly prejudiced in any other way. At most, any prejudice was incidental and therefore insufficient to demonstrate an abuse of discretion on the part of the trial court in denying severance. *See United States v. Martinez*, 922 F.2d 914 (1st Cir.1991).

## IX. PRIOR BAD ACTS

 Kelsey argues that the trial court erred in denying his motion for a mistrial when Payne's attorney cross-examined him about prior bad acts that allegedly occurred in Georgia. We disagree.

On cross-examination, Payne's attorney asked Kelsey if he had had any legal problems or been arrested before July 12, 1994, in Georgia. Kelsey responded that he had not. Payne's attorney then asked Kelsey if he had had any legal problems after July 12, 1994. Before Kelsey could answer, Kelsey's attorney objected. Payne's attorney made an *in camera* proffer of the testimony. Kelsey was asked whether he had ever been charged with the crime of forgery. Kelsey responded that he was not aware of any such charges. Payne's attorney withdrew the question. Kelsey moved for a mistrial which the trial judge denied. When the jury returned, the trial judge gave the following curative instruction: "I have stricken the last question. Let me be sure and remind you that an attorney's question is not evidence and I have stricken all that. So you will disregard that."

 Under Rule 608(b), SCRE, specific instances of the conduct of a witness may be inquired into on cross-examination if probative of the witness's character for truthfulness or untruthfulness. South Carolina's Rule is identical to the Federal rule. The inquiry under Rule 608(b) is limited to those specific instances of misconduct which are clearly probative of truthfulness or untruthfulness such as forgery, bribery, false pretenses, and embezzlement. *See* Weinstein's Federal Evidence, Character and Conduct of Witness § 608.12(4)(a-b) (1998). However, the cross-examiner may not go on a "fishing expedition" in the hopes of finding some misconduct. *State v. McGuire*, 272 S.C. 547, 253 S.E.2d 103 (1979).

In this case, Payne's attorney inquired into a prior act of forgery. When Kelsey stated he was not aware of any such charge, Payne's attorney properly withdrew the question. *See* Rule 609(b), SCRE (specific instances of conduct may not be proved by extrinsic evidence). We hold that any prejudice to Kelsey was cured by the trial judge's curative instruction to the jury. *See State v. Simpson*, 325 S.C. 37, 479 S.E.2d 57 (an instruction to disregard incompetent evidence usually is deemed to have cured the error in its admission unless on the facts of the particular case it is probable that notwithstanding such instruction or withdrawal the accused was prejudiced). Thus, the trial judge did not abuse his discretion in denying the motion for mistrial. *See State v. Crim*, 327 S.C. 254, 489 S.E.2d 478 (decision to deny mistrial will not be overturned on appeal absent abuse of discretion).

## X. DIAGRAM & PHOTOGRAPHS

 Kelsey argues that the trial court erred in admitting State's exhibits 18 and 19 into evidence. We disagree.

Exhibits 18 and 19 consisted of a diagram of the crime scene and photographs of various bone and bomb fragments and clothing found at the scene. Kelsey notes that Richey's body was discovered some forty-six days after the crime was committed. Kelsey suggests that weather or local fauna could have altered the crime scene during this period. Thus, the State's depictions were inaccurate representations of the scene

and therefore prejudicial to Kelsey. Kelsey also argues the evidence was cumulative.

 The relevance, materiality, and admissibility of photographs are matters within the sound discretion of the trial court. If the photographs serve to corroborate testimony, it is not an abuse of discretion to admit them. *State v. Tucker*, 324 S.C. 155, 478 S.E.2d 260 (1996). A photograph should be excluded only if it is calculated to arouse the jury's sympathy or prejudice or is irrelevant or unnecessary to substantiate facts. *Id.* In this case, the photographs corroborated other testimony concerning the condition of Richey's body as first discovered by police at the crime scene. Additionally, the location of bone and bomb fragments clearly supported testimony that a bomb detonated in Richey's mouth. Kelsey merely hypothesizes that the crime scene could have been disturbed by natural forces. We hold that the trial court did not abuse its discretion in admitting the exhibits into evidence.

## XI. CONSPIRACY AND MERE PRESENCE

 Kelsey argues that the trial court erred in failing to give proper conspiracy and mere presence instructions. We disagree.

Kelsey contends that the trial court's mere presence charge was blended in so closely with the accomplice liability charge that it was misleading. Kelsey further argues that the trial court improperly failed to instruct the jury that one's mere association with a person who commits a crime does not make a defendant an accomplice or a co-conspirator to the guilty perpetrator. The trial court's instruction provided, in part:

> Now of course, mere presence at the scene is insufficient to prove someone guilty of a crime. The burden is upon the state to prove every element of the crime charged. If you find after reviewing all of the evidence that the state has proven that the defendant was only present at the scene of the crime and they have not proven beyond a reasonable doubt any other participation in the crime, then you must find a defendant not guilty.

> The law says that proof of mere presence at the scene of the crime is not sufficient to find someone guilty. But, of

course the law also says that the hand of one is the hand of all.

The law says—that if a person—if a crime is committed by two or more persons who are acting together in the commission of a crime, then the act of one is the act of both.

We find the trial court's charge was not misleading. It clearly explained that the prosecution had to prove every element of the crime and that mere presence was not enough to sustain a conviction. Moreover, the trial judge extensively instructed the jury on the requisite criminal intent for each of the charged crimes. In charging the jury on conspiracy, the trial judge explained, "Before a defendant may be convicted ... it must be proven beyond a reasonable doubt that a conspiracy existed and that the defendant was a *knowing party* to the conspiracy...." (emphasis added). We hold that the trial court's instructions, taken as a whole, were adequate. *See State v. Sims,* 304 S.C. 409, 405 S.E.2d 377 (1991) (jury instructions must be considered as a whole and if as a whole, they are free from error, any isolated portions which might be misleading do not constitute reversible error).

## XII. MISTAKE OF FACT

Kelsey argues that the trial court erred in refusing to charge the jury on the law of mistake of fact. Kelsey contends that he believed Richey was dead when he placed the pipe bomb into her mouth. He asserts that even if Richey were alive when he did this, his mistaken belief that she was dead negates the criminal intent required to be convicted of murder. Thus, he was entitled to a jury charge. We disagree.

At trial, Kelsey requested the following jury instruction:

In this case the state is required to prove beyond a reasonable doubt that the defendant Joe Kelsey was not operating under a mistake of fact. If the state can not prove beyond a reasonable doubt that defendant Joe Kelsey knew that the victim was still alive when the pipe bomb was placed in her mouth, then defendant Joe Kelsey is entitled to a verdict of not guilty as to the charge of murder.

A mistake of fact which negates the existence of the mental element of the offense, will preclude conviction. 21

Am.Jur.2d *Criminal Law,* § 141 at 276 (1981); William Shepard McAninch, Criminal Law of South Carolina, 542 (1996). If the particular offense is a general intent crime, the mistake of fact must be reasonable. *See State v. Dixon,* 47 Haw. 444, 390 P.2d 759 (1964) (the mistake must not be due to the negligence or carelessness of the defendant). Moreover, a trial court is not required to give an instruction on mistake of fact unless and until the defendant introduces some evidence, direct or circumstantial, of a reasonable basis for having made the mistake. *United States v. Norquay,* 987 F.2d 475 (8th Cir. 1993).

It is dubious, at best, to suggest that Kelsey's belief in this regard was objectively reasonable. Despite this, there are more fundamental reasons for rejecting Kelsey's argument. First, the trial judge extensively charged the jury on the requisite criminal intent for murder. The trial judge's instruction provided, in pertinent part:

> Murder is the killing of any person with malice aforethought, either express or implied. Again, murder is the killing of any person with malice aforethought, either express or implied. Now, in order to convict these defendants on murder ... the state must prove not only that the defendant killed Melanie Kaye Richey; but they must also prove beyond a reasonable doubt that they did so with malice aforethought.... There must be a combination of the previous evil intent and the act producing the fatal result. Proof of malice may be express or direct, such as, where there is evidence of previous threats or evidence of lying in wait. In other words, circumstances which show directly that an intent to kill existed.

The trial court's instructions made clear that the State not only had to prove that Kelsey killed Richey, but that he did so with the requisite intent, i.e., with malice aforethought. Therefore, Kelsey's belief that Richey was dead would be part of the determination of whether Kelsey "intended" to kill Richey.

We also note that Kelsey's requested jury instruction did not accurately state the law in that it failed to provide that Kelsey's mistake of fact must have been reasonable. The proposed charge only stated that the State must prove beyond

a reasonable doubt that Kelsey was not operating under a mistake of fact. Thus, it was not error for the trial court to refuse to give the requested jury charge. *See State v. Davis*, 282 S.C. 45, 317 S.E.2d 452 (1984) (a trial court does not err in refusing to give a requested jury instruction where it does not state the correct law).

## CONCLUSION

Based on the foregoing, we **AFFIRM** the trial court on all issues.

MOORE, WALLER and BURNETT, JJ., and C. TOLBERT GOOLSBY, Acting Associate Justice, concur.