669 S.E.2d 635

**The STATE, Respondent,**

v.

**Amos Lamont MATTISON, Appellant.**

**No. 4448.**

Court of Appeals of South Carolina.

Heard Sept. 18, 2008.

Decided Oct. 22, 2008.

Rehearing Denied Dec. 19, 2008.

328

Deputy Chief Appellate Defender Robert M. Dudek, South Carolina Commission on Indigent Defense, of Columbia, for Appellant.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, of Columbia; and Solicitor Robert M. Ariail, of Greenville, for Respondent.

HUFF, J.:

Amos Lamont Mattison was convicted of murder, assault and battery with intent to kill (ABIK), and possession of a weapon during the commission of a violent crime. The trial court sentenced Mattison to life imprisonment without parole on the murder charge, one year consecutive on the weapon charge, and twenty years concurrent on the ABIK charge. Mattison appeals, asserting the trial court erred in refusing to instruct the jury that prior knowledge a crime was to be committed is insufficient to establish guilt and that mere association with a person who commits a crime is insufficient to establish guilt. We affirm.

## FACTUAL/PROCEDURAL BACKGROUND

This case involves the shooting injury of Jose Garcia and shooting deaths of his brother, Roberto Garcia, and their cousin, Jorge Lemus. The State set forth the theory that in August 2003, Mattison schemed with Britney Ervin to lure

Jose, Roberto, and Jorge to a remote location to murder them and steal an automobile. Evidence presented at trial through direct testimony and statements given to the police included differing versions of what occurred that day.

Jose testified that on the morning of August 23, 2003, his cousin Jorge awoke him and told him someone wanted to buy Jose's Chevy Impala car. Thereafter, a black, skinny man, whom Jose later identified as Ervin, came to his home and Jose told him the amount of money he wanted for the car. Ervin left, and came back five to ten minutes later requesting to test drive the car. Jose and Ervin left in the car, and as they approached a corner, Jose saw Mattison wave at them, but they did not pick up Mattison at that time. Jose and Ervin then returned to Jose's home, and then Ervin left. About five minutes later, Ervin returned, wanting to make a deal. He indicated he had to go to his grandfather's house to get money. Jose and Ervin drove off to get the money, and Roberto and Jorge followed them in a Honda Passport automobile in order to bring Jose back home after he sold the car. As they drove they saw Mattison at the same location as before, and Jose and Ervin stopped and picked up Mattison. Mattison and Ervin talked and appeared to know each other. They directed Jose down a dirt road, and although he hesitated to drive down it, he did so at the forceful insistence of Ervin.

Mattison and Ervin exited the car and walked around the house. They were gone about ten minutes. Mattison returned to the car and began talking to Jose. Mattison told Jose he did not want to go back around the house because Ervin's grandfather did not like him. After waiting approximately fifteen minutes, Jose was about to leave, but Ervin came back from around the house and told Jose his grandfather was going to give him the money. Ervin said he needed help with a tire, and Roberto went around the house with Ervin to assist him. Jorge exited the Honda and approached Jose to ask what was happening. Jose then heard a gunshot. Jose and Mattison exited the Impala. Mattison told Jose that Ervin's grandfather was crazy and he was shooting. Jose, Jorge and Mattison then went around the house, where Jose observed Ervin with a gun in his hand, coming toward the three men. When Jorge saw Ervin with the gun, he ran. As

Ervin chased Jorge, Mattison told Jose not to worry because he had a gun too, and he was going to help them. Mattison then pulled out a handgun. Ervin caught Jorge and brought him back. The four then continued toward the back of the house, with Jose and Jorge in front followed by Ervin and then Mattison. As they approached a building behind the house, Jose asked where his brother was. Ervin put a gun to Jose's head and told him to keep walking.

As they reached the corner, Jose heard his brother moaning and then saw him face down on the ground. Jose told Mattison and Ervin to just take the cars and let him get his brother to a hospital. Ervin then pointed the gun at Jose. As Ervin raised the gun to shoot Jose, Jorge jumped on top of Ervin and Jose then jumped in, and a struggle ensued over Ervin's gun. Jose looked up and saw Mattison standing in the same corner as before with his gun in his hands. During the struggle over the gun with Ervin it fired, but did not hit Jose. Ervin was trying to shoot Jose, and Ervin told Mattison, more than once, to shoot Jose. Jose then heard a gunshot from Mattison's direction and felt his shirt fly. He turned and looked at Mattison, and saw him run. Jose noticed Jorge was getting weaker and saw him fall to the ground. After Ervin saw Mattison run away, he asked Jose to let go of the gun and stated he would do the same. Jose did not, but eventually obtained control over the gun and Ervin then ran. As Jose left to seek help, he noticed both the Chevy and the Honda were gone.

Jose suffered a bullet graze injury to his shoulder during the struggle. Roberto and Jorge were transported to the hospital where both were eventually pronounced dead. Roberto died from a gunshot wound to the abdomen and another to the pelvis. Jorge died from a gunshot wound to the head. The two bullets recovered from Roberto were fired from the caliber nine millimeter Luger gun that Jose had taken from Ervin in the struggle. The bullet recovered from Jorge was a thirty-two caliber, fired from a different gun which was never found by the authorities.

Jose gave a statement to police describing his assailants as a fat guy and a skinny guy. He identified Ervin, the one he described as skinny, from a photographic line-up after Ervin

was arrested driving Jose's Chevy Impala. Jose made an in-court identification of Mattison as the other man who rode in the back of his car and ultimately shot in his direction. When asked if, seeing Mattison in the court room he would describe him as "the fat guy," Jose stated he would, noting that he had been wearing a loose shirt and that is why he described him as fat.

After his arrest, Ervin gave two statements to the authorities. In his first, Ervin claimed Mattison asked him to help set up some Mexicans so he could rob them for their drugs. He claimed Mattison told him to act like he wanted to purchase their car, and threatened Ervin to get his cooperation. Ervin claimed after he directed them to his grandfather's shop, Mattison told him to go to the back with him. There, Mattison pointed a twenty-two caliber pistol at Ervin and told him to get the Mexicans. Mattison gave Ervin a nine millimeter gun to use. Mattison told Ervin to shoot the Mexicans, but he refused. Mattison took the nine millimeter gun from Ervin and shot the Mexicans. When Mattison started firing, Ervin ran. Ervin's second statement indicated it was given to correct his first statement as to "how the shooting went down." There, Ervin stated that Mattison stayed with two of the Mexicans at the car while he walked to the shop with a short Mexican. Ervin pulled out the nine millimeter gun, the Mexican tried to run, and he then shot him in the chest. Ervin then walked up to him and shot him in the neck. He did this because Mattison had told him the Mexicans had drugs in the house, and Mattison planned to kill them to steal the drugs. As Ervin walked back to the others, Mattison had the twenty-two caliber gun pulled on the Mexicans. Ervin pointed the nine millimeter at them and directed them to the back of the shop where he planned to kill them. One of them saw the man Ervin had shot and began fighting Ervin. The other one struggled with Ervin over the gun and the gun discharged. When that happened, Mattison fired his gun. One of the Mexicans got control over Ervin's pistol and Ervin ran.

At trial, Ervin denied telling the authorities much of what was in his two statements. He also gave a different version of events, claiming that Mattison brought some Mexicans to his home that day to see if Ervin wanted to buy a car. Ervin

agreed to buy it, but it had a dent in the trunk and Mattison told him he knew where he could find another trunk. Ervin, Mattison, and one of the Mexicans then followed behind two other Mexicans in the Honda to Ervin's grandfather's property. According to Ervin's trial testimony, Mattison asked Ervin to help him rob the Mexicans. Mattison then took one of the Mexicans with him to the back of the shop. Ervin heard some gun shots, and the other Mexicans ran up to him and asked what was happening. Ervin told them he did not know. Mattison ran back to the front, and Ervin then jumped in the Chevy and left.

Mattison did not testify at his trial. A statement Mattison made was, however, read into the record. Mattison claimed in his statement that Ervin brought a Mexican to his house trying to buy Mattison's car in exchange for drugs. Mattison stated he wanted money, not drugs. Ervin indicated they would have to get the money from Ervin's grandfather. Mattison rode with Ervin and the Mexican in a black car while a short, black man named Chuck or Bud followed in a gray car with two other Mexicans. Ervin and the Mexican exited the car and went around the house, while the Mexicans from the gray car were with Mattison and Chuck remained in the gray car. Mattison heard a "pop, pop," and said "let's go," but the Mexican refused because of his brother. They then ran to the back of the house. Mattison heard "pop, pop" again, and he then took off running the other way. As he ran up the driveway, he saw Ervin drive off in the black car.

After the State rested, the trial court granted Mattison's directed verdict motions on the charge of possession of a weapon during the commission of a violent crime as related to the murder of Roberto, as well as on the charge of grand larceny of the Honda Passport. At the close of the evidence, Mattison handed the court his requests to charge. The trial court indicated it would cover the requests, but not exactly the way Mattison had asked. When asked whether the charge would include "prior knowledge is not sufficient, mere association," the court indicated it would not charge that. Counsel took exception to the court's refusal to so charge. The jury found Mattison guilty of the murder of Jorge and possession of a weapon during the commission of violent crime as related to Jorge, as well as the assault and battery with intent to kill

Jose. On the charge of the murder of Roberto, the jury was unable to reach a verdict, and the trial court declared a mistrial. This appeal followed.

## LAW/ANALYSIS

Mattison contends the trial court erred in refusing to charge the jury on prior knowledge and mere association. He asserts he was entitled to a charge that prior knowledge a crime is going to be committed, without more, is insufficient to establish guilt. He maintains there is evidence of record from Jose that Mattison was with him at the car when the shooting began and that Mattison wanted to leave immediately, but Jose was concerned about his brother. Further, according to Mattison's statement, upon hearing the shots, he "took off running the other way." Mattison contends it was important for the jury to understand that if it found Mattison was present at the scene, that his knowledge Ervin was going to commit a crime, without more, was insufficient to make him guilty of those crimes. He further asserts it was important for the jury to understand that mere association with the perpetrator of the crime is also insufficient to prove guilt.

The law to be charged must be determined from the evidence presented at trial. *State v. Knoten*, 347 S.C. 296, 302, 555 S.E.2d 391, 394 (2001). Generally, a trial court is required to charge only the current and correct law of South Carolina. *Sheppard v. State*, 357 S.C. 646, 665, 594 S.E.2d 462, 472 (2004). A jury charge is correct if it contains the correct definition of the law when read as a whole. *Id.* A trial court has a duty to give a requested instruction that is supported by the evidence and correctly states the law applicable to the issues. *State v. Peer*, 320 S.C. 546, 553, 466 S.E.2d 375, 380 (Ct.App.1996). A trial court commits reversible error if it fails to give a requested charge on an issue raised by the evidence. *State v. Hill*, 315 S.C. 260, 262, 433 S.E.2d 848, 849 (1993). A trial court's decision regarding jury charges will not be reversed where the charges, as a whole, properly charged the law to be applied. *State v. Rye*, 375 S.C. 119, 123, 651 S.E.2d 321, 323 (2007).

Mere association with admitted members of a conspiracy is insufficient to tie other persons to the conspiracy.

*State v. Barroso,* 328 S.C. 268, 272, 493 S.E.2d 854, 856 (1997). Additionally, "[m]ere presence and prior knowledge that a crime was going to be committed, without more, is insufficient to constitute guilt." *State v. Thompson,* 374 S.C. 257, 262, 647 S.E.2d 702, 705 (Ct.App.2007). "However, 'presence at the scene of a crime by pre-arrangement to aid, encourage, or abet in the perpetration of the crime constitutes guilt as a [principal].' " *Id.*

Mattison points to the *Thompson* case for the proposition that prior knowledge that a crime is going to be committed, without more, is insufficient to constitute guilt. However, the issue in *Thompson* was not whether the court failed to properly charge the jury, but whether Thompson was entitled to a directed verdict because the State failed to present any direct or substantial circumstantial evidence to show that Thompson was guilty of first degree burglary or attempted armed robbery, either as a principal or as an accomplice. Further, this court noted in *Thompson* that while mere presence and prior knowledge, without more, are insufficient to establish guilt, presence at the scene of a crime by pre-arrangement to aid, encourage, or abet in the perpetration of the crime will constitute guilt as a principal. *Thompson,* 374 S.C. at 262, 647 S.E.2d at 705.

In *State v. Kelsey,* 331 S.C. 50, 502 S.E.2d 63 (1998), our supreme court held a charge to be sufficient, though the trial court failed to charge mere association. The court ruled that the trial court's charge was not misleading, it clearly explained the prosecution had to prove every element of the crime such that mere presence was not enough to sustain a conviction, and the trial judge extensively instructed the jury on the requisite criminal intent for each of the charged crimes. *Id.* at 77, 502 S.E.2d at 76–77.

In the present case, the record shows the trial court charged the jury as follows:

> Ladies and Gentlemen, a principal in a crime is one who either in person perpetrates the crime or who being present aides and abets and assists the commission of that crime. I charge you, Ladies and Gentlemen, that mere presence at the scene of a crime is not sufficient to convict.

However, when one does an act in the presence of or with the assistance of another, the act is done by both. Where two or more acted with a common design or intent is present at the commission of a crime, it does not matter by who (sic) the crime is committed, for all are guilty.

Intent, however, Ladies and Gentlemen, is a necessary element of the offense. There must have been a common design or attempt to commit the crime. The crime must have been committed pursuant to the person aiding and abetting by some overt act. Now, presence at the commission of a crime means to be sufficiently near so as to be able to aid and abet in its commission.

Stated somewhat differently, Ladies and Gentlemen, is several, two or more persons pursuit (sic) to a common design to commit an unlawful act, set out together and each takes a part agreed upon or assigned to him to commit the act or which to watch at a proper distance at stations to prevent an appearance or surprise or to encourage the commission of unlawful act or to assist, if necessary, escape of those immediately engaged in the commission of the unlawful act, under any or all of these circumstances, if the unlawful act is committed, the act is one, the act of one is the act of all and all would be guilty.

In other words, if several persons agree or conspire to commit a crime, each of those persons are criminally responsible for the acts of his confederates of which are done in the presence of the common purpose for which they combined. The common purpose may have not included or involved killing anyone.

But if in executing the common design and purpose, a common homicide is committed by one of the confederates and you, the jury, determine from all the evidence beyond a reasonable doubt that the homicide was a probable and natural consequence of the acts which was done in pursuit to the common design, then Ladies and Gentlemen, all who are present either actually or constructively and participated in the unlawful common design would be guilty.

The charge to the jury included a detailed instruction on aiding, abetting, and assisting in the commission of a crime through some overt act, and clearly indicated that mere

presence alone was insufficient to sustain a conviction. The charge noted that there must be a common design to commit an unlawful act, and that one present must aid, abet or assist in the commission of that crime in order to be found guilty. It explained the prosecution had to prove every element of the crime such that mere presence was not enough to sustain a conviction. Implicit in the charge given to the jury was that mere knowledge a crime was going to occur, or mere association with one who commits a crime is insufficient to constitute guilt, but that Mattison must have, while present at the commission of the crime, aided, abetted, or assisted in the commission of the crime pursuant to a common design or purpose before a conviction could be had. Accordingly, the trial court's jury charge on the whole was proper.

For the foregoing reasons, we find no error in the trial court's charge to the jury. Mattison's convictions are therefore

**AFFIRMED.**

HEARN, C.J., and GEATHERS, J., concur.