Issue

THE STATE OF SOUTH CAROLINA
In The Court of Appeals

 
 
 
The State,       
Respondent,
 
 
 

v.

 
 
 
Jay Lamar McClellan,       
Appellant.
 
 
 

Appeal From Georgetown County
John M. Milling, Circuit Court Judge

Unpublished Opinion No. 2003-UP-319
Submitted April 7, 2003 - Filed May 
 7, 2003

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED

 
 
 
Deputy Chief Attorney Joseph L. Savitz, S.C. Office of Appellate 
 Defense, of Columbia, for appellant.
Attorney General Henry Dargan McMaster, Chief Deputy Attorney 
 General John W. McIntosh, Assistant Deputy Attorney General Charles H. Richardson 
 and Assistant Attorney General Deborah R. J. Shupe, all of Columbia; and Solicitor 
 John Gregory Hembree, of Conway, for respondent.
 
 
 

PER CURIAM:  Jay Lamar McClellan (McClellan) 
 appeals his conviction of aiding and abetting homicide by child abuse, and his 
 sentence of life in prison without parole.  We affirm in part, reverse in part, 
 and remand.
FACTUAL/PROCEDURAL BACKGROUND
McClellan was convicted for his actions surrounding 
 the death of Brandon Ward, the two-year old son of Sabrina Bone.  McClellan 
 moved in with Bone and her children some time around Thanksgiving 1999.  The 
 record shows, at approximately 8:30 p.m. on January 31, 2000, a call was placed 
 to Georgetown County 911 regarding the possible drowning of a child who was 
 found face down in a bathtub.  A volunteer with the Fire Department was the 
 first to arrive on the scene, and found Bone screaming and crying while talking 
 on the phone to 911.  McClellan came out the door carrying Brandon, and threw 
 him to the volunteer.  Shortly thereafter, EMS arrived and put Brandon in the 
 ambulance.  Bone told one of the paramedics she found Brandon face down in the 
 bathtub.  Brandon had no pulse, was not breathing, and was in cardiac arrest.  
 The paramedic testified Brandons condition was not consistent with a drowning, 
 but it appeared to be more trauma related because he had bruises throughout 
 his body.  
When Brandon arrived at the hospital, he was not 
 breathing and had no vital signs, no pulse, and no neurological function.  Although 
 Dr. William Richmond and the hospital staff attempted to resuscitate Brandon, 
 their attempts were futile.  Dr. Richmond testified that, upon examination, 
 it was clear to him that Brandons death was a traumatic one due to injury and 
 was not consistent with drowning.  He stated Brandon was horribly injured, 
 he had an unbelievable number of bruises and contusions and in seventeen 
 years, [he] had never seen the number of injuries sustained by any . . . pediatric 
 trauma patient than [he] had seen on Brandon.  Dr. Richmond noted Brandon had 
 a tremendous amount of injury to his head and neck, and the injuries appeared 
 to have all been inflicted within twenty-four hours of Brandons death.  He 
 further stated because of the whole confluence of injuries on Brandon, and 
 the way they appeared, they could not have occurred from a fall or an accident, 
 but were most likely inflicted by another individual.  
Forensic pathologist Dr. Kim Collins performed 
 an autopsy on Brandon the following day.  She discovered Brandon had numerous 
 bruises and abrasions over his head, neck and back.  On his head alone, from 
 his chin up, he had over thirty bruises.  There were knuckle size bruises on 
 the right side of Brandons jaw, and a large area of bruising on the right side 
 of his head.  Dr. Collins found a large area of hemorrhage under Brandons scalp, 
 as well as a skull fracture on the right side of his head, and blood under the 
 skull bleeding into the brain.  He also had a large bruise over his left eye 
 and multiple bruises over his chin, as well as an abrasion and bruises to the 
 neck.  The abrasion to his neck went around the circumference of his neck and 
 was caused by a ligature.  He had hemorrhage into the muscles around the neck, 
 which Dr. Collins opined would have required a great deal of force.  She further 
 testified that Brandons brain was very swollen, and that the bruising to the 
 brain would have also required a great deal of force.  Dr. Collins stated the 
 bruises all appeared to be of the same age, and occurred within twenty-four 
 hours of his death.  The cause of Brandons death was asphyxia, with blunt 
 force trauma to the head.  
Frankie Duncan, Brandons grandmother, testified 
 that on Sunday morning, January 30, 2000, she took Brandon and his twin brothers 
 to church, as was her usual habit.  When she bathed Brandon that morning, she 
 did not notice any bruises on Brandon besides a pre-existing injury to the back 
 of his head.  After church, Frankie took the children home and left them with 
 Bone and her boyfriend, McClellan.  Although Brandon usually wanted to go back 
 home after church, on this occasion, he begged his grandmother to not take him 
 there.  
The next morning between 11:00 a.m. and 12:00 noon, 
 Bones cousin by marriage, Tonya Elliott, visited the home.  When she arrived, 
 McClellan was awake but Bone was still in bed asleep.  Elliott noticed some 
 bruises on Brandons forehead and temple and two lines across his neck.  She 
 stated Brandon was whining and crying, and Bone questioned McClellan about why 
 he had not awakened her to change the childs wet diaper.  Bone also asked McClellan 
 about the bruises on the childs head.  McClellan stated Brandon had fallen 
 in some butter and hit his head on the couch, but claimed the child had not 
 cried.  When Elliott suggested the child needed to be seen by a doctor, 
 McClellan gave no response, and Bone stated she couldnt take him because of 
 the DSS.  Later that day when she saw Bone, she asked her how Brandon was doing 
 and Bone told her he was fine.  Elliott indicated the bruises and neck marks 
 she observed that morning were not as extensive as those observed on Brandons 
 body after his death.  
The testimony at trial indicated McClellan and 
 Bone drove around that day with Brandon, the three year-old twins, and McClellans 
 cousin, Marvin, attempting to cash a check.  Marvin testified he was with them 
 for approximately two hours, and that Brandon slept most of that time.  At one 
 point, Brandon raised up in his car seat and looked at Marvin, at which time 
 Marvin noticed the child was bruised up.  At that time, Marvin told them they 
 needed to take Brandon to the doctor.  Marvin estimated he returned to his home 
 between 6:00 and 7:00 that evening.  
After their arrival at Bones home around 7:00 
 that evening, Bone left the children alone with McClellan while she went to 
 her grandmothers to obtain food for the family.  Bones grandmother testified 
 Bone was at her house for at least fifteen to twenty minutes filling up three 
 grocery bags and making three trips to her car.  
McClellan testified that after Bone arrived home, 
 he started the water for the childrens bath.  He put Brandon in the bathtub 
 with the twins and then went into the kitchen while Bone stayed in the bathroom 
 pulling out face clothes.  Bone then walked into the kitchen and was preparing 
 the food when the children started splashing water.  Bone walked back into the 
 bathroom to stop them.  McClellan claimed that after the children continued 
 splashing water, Bone entered the bathroom again and he heard her beating all 
 the children.  McClellan went to the bathroom door and saw Bone spanking Brandon 
 in the areas of the small of his back and his buttocks with her hand.  McClellan 
 then turned and walked out.  Bone came back into the kitchen, and one of the 
 twins then came into the kitchen saying, Mama, Brandon.  Bone then led the 
 child back to the bathroom, at which time she ran back out screaming and carrying 
 Brandon.  McClellan testified Bone handed Brandon to him, and he noticed the 
 child had turned blue.  
Testimony showed, at the time Brandon received 
 his injuries, Bone was wearing a cast on her left hand.  McClellan stated in 
 one of his statements to police that he had to assist Bone in doing everything 
 because of her injury.  He again admitted at trial that because she didnt have 
 the use of both hands, he had to help Bone do just about everything she did 
 after she messed up her thumb.  
The State presented the testimony of Tonya Etheridge, 
 who was in the Georgetown County Detention Center at the same time as McClellan 
 in May 2001.  Etheridge testified she knew both Bone and McClellan, and that 
 McClellan called her over to talk with him.  He questioned Etheridge about her 
 knowledge of what had happened and then asked her if she thought he had done 
 it.  He then stated to her that somebody had to punish the little bastards.  
 Etheridge stated McClellan was laughing throughout their discussion.  
The State also presented the testimony of Tammy 
 Drawdy, who lived with Bone and McClellan in the two-week period prior to Brandons 
 death.  Drawdy testified that she observed McClellan spanking Bones five year-old 
 daughter when he got upset with her.  She stated McClellan grabbed the child, 
 held her up by the arm and was just beating her.  She further testified that 
 on Saturday morning, Brandon had come to her about 8:00 asking for some milk.  
 She told him to go ask Bone.  Brandon went to the door, turned around and came 
 running back, stating that McClellan was in the room.  When Drawdy again told 
 Brandon to ask his mother and assured him McClellan would not bother him, Brandon 
 refused, and Drawdy ultimately got up and gave Brandon some milk.  
Finally, the State presented the testimony of Anthony 
 Elliott, who testified that the day after Brandons death, McClellan stated 
 to him that he (McClellan) had to get away from town.  The parties stipulated 
 that Bone was charged with and convicted of homicide by child abuse in the death 
 of Brandon.  
McClellan was indicted for murder, homicide by 
 child abuse, and aiding and abetting homicide by child abuse.  McClellan moved 
 for a directed verdict on all charges at the conclusion of the States case.  
 The trial court granted McClellans motion for a direct verdict on the murder 
 charge but denied it for the other charges.  
A jury acquitted McClellan of the homicide by child 
 abuse charge, but convicted him of aiding and abetting homicide by child abuse.  
 The trial court sentenced McClellan to life imprisonment without parole under 
 S.C. Code Ann. § 17-25-45(A) after concluding he had a previous conviction for 
 car jacking.  
ISSUES
 I.                  
 Did the trial judge err in failing to direct a verdict of acquittal for 
 McClellan on charges of aiding and abetting homicide by child abuse?
 II.               
 Did the trial judge err by sentencing McClellan to life without parole 
 where the State did not provide written notice under S.C. Code § 17-25-45?
LAW/ANALYSIS
I.  Motion for Directed Verdict
McClellan first contends that the 
 trial judge erred in refusing to direct a verdict on the charge of aiding and 
 abetting homicide by child abuse.  He argues the State only proved he was merely 
 present at the time Bone beat and strangled Brandon, and failed to prove he 
 aided and abetted in Brandons homicide.  We disagree.
In reviewing the denial of a motion for a directed 
 verdict, the evidence must be viewed in the light most favorable to the State, 
 and if there is any direct evidence or any substantial circumstantial evidence 
 reasonably tending to prove the guilt of the accused, an appellate court must 
 find that the case was properly submitted to the jury.  State v. Kelsey, 
 331 S.C. 50, 62, 502 S.E.2d 63, 69 (1998).  In ruling on a motion for a directed 
 verdict, the trial court is concerned with the existence of evidence, not its 
 weight.  Id.  If the State presents any evidence which reasonably tends 
 to prove the defendant's guilt or from which his guilt could be fairly and logically 
 deduced, the trial court must send the case to the jury.  State v. Jarrell, 
 350 S.C. 90, 97, 564 S.E.2d 362, 366 (Ct. App. 2002).
A person is guilty of homicide by child 
 abuse who . . . knowingly aids and abets another person to commit child abuse 
 or neglect as defined in Section 20-7-490 and the child abuse or neglect results 
 in the death of a child under the age of eleven.  S.C. Code Ann. § 16-3-85(A)(2) 
 (Supp. 1999). [1]   Aid and abet has been defined as [h]elp, assist, or facilitate 
 the commission of a crime, promote the accomplishment thereof, help in advancing 
 or bringing it about, or encourage, counsel, or incite as to its commission.  
   Blacks Law Dictionary 68 (6th ed. 1990).  It comprehends all assistance 
 rendered by words, acts, encouragement, support, or presence, actual or constructive, 
 to render assistance if necessary.  Id.  
We believe when viewing the evidence in a light 
 most favorable to the State, substantial circumstantial evidence existed which 
 reasonably tended to prove McClellans guilt of aiding and abetting child abuse.  
 The trial testimony indicated Brandon suffered numerous bruises, abrasions, 
 and blunt force trauma at a time when he was only in the care of McClellan and 
 Bone.  On the day before Brandons death, he was found injured while his mother 
 was asleep and McClellan was awake.  Further, the young children were left in 
 McClellans care for at least fifteen minutes during the one and a half hour 
 period prior to the 911 call.  The medical expert testimony indicated that there 
 were numerous bruises and abrasions to Brandons head and back and strangulation 
 marks on his neck that could not have occurred from an accident, but were intentionally 
 inflicted by another.  The pathologist testified that both the neck injury and 
 the bruising to Brandons brain would have required a great deal of force, yet 
 the evidence showed Bones left hand was in a cast at the time of the incident, 
 making it difficult for her alone to have inflicted the numerous, forceful injuries 
 on Brandon.  Further, McClellan admitted in his statement to police and again 
 at trial that he had to help Bone do everything because of her injury. 
Finally, there was testimony that McClellan indicated 
 he needed to leave town the day after Brandons death, and that he made a statement 
 that somebody had to punish the little bastards in reference to the incident.
We therefore find the State presented sufficient evidence 
 that McClellan knowingly aided and abetted Bone in the murder of her son such 
 that the trial judge properly denied his motion for directed verdict.
II.  Sentencing
McClellan next asserts the trial court erred in sentencing 
 him to life without parole where the State did not provide written notice under 
 S.C. Code Ann. § 17-25-45.  We agree.
South Carolina law provides a person who is convicted 
 of a most serious offense as defined by the section must be sentenced to a 
 term of life imprisonment without the possibility of parole if the person has 
 a prior conviction for a most serious offense.  S.C. Code Ann. § 17-25-45(A)(1) 
 (2003).  Aiding and abetting homicide by child abuse is a most serious offense 
 under South Carolina Code Ann. § 17-25-45(C)(1) (2003).  Further, McClellan 
 had previously been convicted of carjacking, another most serious offense 
 under South Carolina Code Ann. § 17-25-45(C)(1) (2003).  Thus, with the conviction 
 for aiding and abetting, McClellan was eligible for life imprisonment without 
 parole.  
However, the statute further provides, Where the solicitor 
 is required to seek or determines to seek sentencing of a defendant under this 
 Section, written notice must be given by the solicitor to the defendant and 
 defendants counsel not less than ten days before trial.  S.C. Code Ann. § 
 17-25-45(H) (2003).
Counsel objected at sentencing because the State 
 failed to give written notice of its intent to seek life imprisonment without 
 parole as required by subsection (H) of the statute.  The judge held the provision 
 was inapplicable because the sentence was mandatory pursuant to subsection (G). 
 [2] 
In State v. Johnson, 347 S.C. 67, 552 S.E.2d 
 339 (Ct. App. 2001), this court addressed the States duty to notify a defendant 
 of its intent to seek a life sentence without the possibility of parole under 
 S.C. Code Ann. § 17-25-45(A).  There, we held § 17-25-45(H) clearly mandated 
 the solicitor provide written notice to a criminal defendant before he could 
 be sentenced to life imprisonment without parole.
Because it is undisputed that the Solicitor failed 
 to provide McClellan with written notice as required by § 17-25-45(H), the trial 
 court erred in sentencing him to life without parole.  Accordingly, we reverse 
 and remand to the trial court for resentencing consistent with this opinion.
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
CONNOR, ANDERSON and HUFF, JJ., concur.

 
 [1] This 
 statute was amended, effective May 1, 2000, deleting reference to § 20-7-490, 
 which at the relevant time included the definitions of abused or neglected 
 child and harm under the Domestic Relations Code, and adding definitions 
 for child abuse or neglect and harm directly to the statute.  S.C. Code 
 Ann. § 16-3-85 (Supp. 2001); S.C. Code Ann. § 20-7-490 (Supp. 2000).  

 
 [2] South 
 Carolina Code Ann. § 17-25-45(G) (2003) provides that the decision to invoke 
 life without parole following conviction for a serious offense under §17-25-45(B) 
 is in the discretion of the solicitor, while the provision for such sentencing 
 following a most serious offense under § 17-25-45(A) is mandatory.