THIS OPINION HAS NO PRECEDENTIAL VALUE

THIS OPINION HAS NO PRECEDENTIAL
VALUE.  IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING
EXCEPT AS PROVIDED BY RULE 239(d)(2), SCACR.
THE STATE OF SOUTH
CAROLINA
In The Court of Appeals

 
 
 
 The
 State,        Respondent,
 
 
 

v.

 
 
 
 Edmond Stanley
 Adams, III,        Appellant.
 
 
 

Appeal From Richland County
James C. Williams, Jr., Circuit Court Judge

Unpublished Opinion No.
2005-UP-520
Submitted September 1, 2005  Filed September 15, 2005
   

AFFIRMED   

 
 
 
 Tara D. Shurling, of Columbia,
 for Appellant.
 Attorney General Henry
 Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Senior
 Assistant Attorney General Charles H. Richardson; and Solicitor W.
 Barney Giese, all of Columbia, for Respondent.
 
 
 

PER CURIAM: Edmond
Stanley Adams, III., appeals his convictions of  Criminal Sexual Conduct in
the First Degree, Armed Robbery and Kidnapping.  We affirm.[1]
FACTS
On Sunday night, August 16, 1998, Adams
asked a co-worker, Victim, to give him a ride home after work from Mr. Friendlys
in exchange for a marijuana cigarette.  Victim drove Julie Myrick, another
co-worker, home first because her residence was closer.  Afterwards, Victim
proceeded to Adams house.  On the way to Adams house, Adams
talked about his girlfriend.  Upon arriving at Adams home, Victim stayed in the car, while he went inside to get
the marijuana cigarette.  He came back out and told Victim that his
girlfriend was awake and wanted to meet her.  Victim went into his
house.  Once inside, Adams pretended to have a
conversation with someone in the house, and asked Victim to wait in a bedroom to
meet his girlfriend.  Victim complied, and shortly thereafter Adams
entered the bedroom, alone, with two belts and a knife.  At that time Adams
told Victim that she was his girlfriend.
Adams hit Victim and demanded she undress.  He pushed her onto
the bed and removed her pants.  He repeatedly struck her head.  When
she refused to take off her bra, he put the knife to her throat and threatened
her life.  Then he tied her hands behind her back with his belt and forced
her to engage in oral sex, as well as vaginal and anal intercourse.  While
he was raping her, Victim became ill, and had diarrhea on the sheets.  Adams
allowed her to go to the bathroom to clean herself.  When she refused to
come out of the bathroom, he barged in and dragged her out.  Adams
tied her ankles together with another belt and demanded she tell him if she had
any money and where the keys were to her car.  Adams
informed Victim that he was going outside to move her car, and if she was not in
the exact same position when he returned, he would kill her.  While Adams was gone, she untied the belts and pushed out a window
screen.  She jumped out the window, using a curtain to cover herself. 
Victim ran down the street screaming and looking for help, but no one heard her.
 Eventually, Adams tackled her into a ditch full of
water.  He strangled her and held her head down in the ditch, choking her
until she passed out.  She woke up screaming, so Adams
forced her head into the ditch again and she lost consciousness a second
time.  When she awakened, Adams made her drive around
for a while.  Later, he made her lie down in the backseat while he drove
back to his house.  Adams demanded she shower, and he
raped her again. 
Victims mother and boyfriend were
concerned when Victim did not arrive home as expected that evening.  After
she had been missing for a few hours, they called the owner of Mr. Friendlys,
Mr. Krsitian Niemi, and he subsequently called the police.  Niemi informed
the police that Victim had offered to drive Myreck and Adams home after work.
As Adams was
raping her again, the police knocked at his door.  He answered the door,
dressed only in a towel, and the police asked him if Victim was at his
house.  She dressed while the officers were questioning him about her
whereabouts.  Adams instructed her to tell the officers that everything was fine. 
She whispered to one of the officers that Something has happened. 
Officer William Meyer noted that Victims voice was not normal.  Finally
able to escape, Victim left Adams house and drove
home. 
Once she arrived at her mothers
house, she told her mother what had transpired, and her mother called the police
and EMS.  Victim told law enforcement that it was Adams who had raped
her, held her hostage, assaulted her and stolen money from her.  She was
taken to the emergency room where her physical injuries were documented, and a
rape protocol kit was performed by Dr. Alexis Klock.  She sustained
bruising and redness on her neck, bruising and redness to her eye, imprints of
finger marks around her neck, scratch marks on her breast, abdomen and stomach,
and brush burn marks and abrasions on both knees and thighs.  Dr. Klocks
examination of Victim revealed the presence of blood and fecal matter on
Victim.  No spermatozoa was detected, but Dr. Klock indicated that sperm is
not always found.  Victim was found to have experienced trauma consistent
with vaginal and anal rape.  Victim continued to have difficulty with her
eye after the incident.  Several days later, she scheduled an appointment
with Dr. John Hindersman, an ophthalmologist.  He diagnosed her with
traumatic subconjunctival hemorrhage caused by blunt trauma, most likely a fist,
to her eye.  The injury was consistent with her description of Adams
attack.
Once Victim was at the hospital,
Officer Meyer went back to the scene.  He found a bare footprint in the mud
near Adams residence as well as a ditch full of water.  The next
day, her bracelet was found in the ditch, and dirt and debris were found in her
car.  A search warrant was executed for Adams home.
After knocking and announcing their
presence at the front and side doors to no avail, the officers broke into the
side door of Adams home.  They entered, discovered Adams
hiding under the couch and arrested him.  At the house, they found dirt and
debris in the bathtub, as well as long blond-brown hair in the drain.  Upon
further investigation, they found a window screen that had been pushed-out onto
the ground.  All of the other screens were intact in their respective
windows.  The window with the missing screen had broken cobwebs, evidence
of being recently opened.  Additionally, the officers found paint chips and
flecks on the window sill and on the bricks below the window.  The paint
had recently been chipped, because the wood where the paint was missing was
lighter than wood on other areas of the house exposed to the weather. 
Moreover, because of recent rain in the area, the officers knew that the window
had just been pushed out because the paint chips and flecks had not yet been
washed away.
Dr. Donna Schwartz-Watts, an expert
in the field of forensic psychiatry, said that Victims reaction to the
officers when they appeared at Adams house the night of
the kidnapping and rape was normal.  Victim was desperately trying to
escape and was not thinking rationally.  Dr. Schwartz-Watts averred that
Victim is suffering from Post Traumatic Stress Disorder due to the incident.
Adams
represented himself at trial. The trial judge appointed Mr. McCulloch as standby
counsel.  The trial proceeded and the jury convicted him of all three
charges, criminal sexual assault, kidnapping and armed robbery.  He was
sentenced to twenty-five years for kidnapping, twenty-five years for first
degree criminal sexual assault and fifteen years for armed robbery to be served
consecutively.
STANDARD OF REVIEW
The appellate court may review
criminal cases for errors of law only.  State v. Wilson,
345 S.C. at 5, 545 S.E.2d 827, 829 (2001), State v. Wood, 362 S.C. 520,
608 S.E.2d 435 (Ct. App. 2004), State v. Mattison, 352 S.C. 577, 575
S.E.2d 852 (Ct. App. 2003).  Unless clearly erroneous, this court is bound
by the trial courts factual findings.  Id.
at 6, 545 S.E.2d at 829.  Upon review, this court is limited to determining
whether or not the trial judge abused his discretion.  Id. 
DISCUSSION
I.      
Delay of Trial
Adams argued that delaying his case beyond 180 days violated the South
Carolina Constitution and his right to a speedy trial.  We disagree.
The South Carolina Supreme Court
affirmed the trial court that refused to quash an indictment due to the States
failure to act upon the warrant within 90 days as provided by then Circuit Court
Rule 95 because the rule was administrative rather than jurisdictional.  State
v. Culbreath, 282 S.C. 38, 39, 316 S.E.2d 681, 681 (1984).  The court
explained:

 Rule 95 is an administrative rule
 adopted for the purpose of insuring an orderly and prompt disposition of cases
 in the Circuit Court. While the rule is designed to secure a prompt handling
 of cases, it was not intended to be the criterion for determining whether the
 constitutional guaranty of a speedy trial has been met.  Therefore, the
 failure of the solicitor to act upon a warrant within ninety (90) days, as
 required by Rule 95, does not within itself invalidate a warrant or prevent
 subsequent prosecution.

Id. at 39-40, 316 S.E.2d at 681. Circuit Court Rule 95, the
predecessor to Rule 3, was crafted to insure an orderly and prompt disposition
of cases in the Circuit Court.  Id.  Although the rule was created to insure the prompt
handling of cases, the rule was not designed to be a constitutional guaranty of
a speedy trial.  Id.  Adams has no right to a trial
within 180 days. 
Since there is no guarantee to a
speedy trial and only a promise of efficiency, Adams must prove that he was
prejudiced by the delay in trial and that the State was negligent and willful in
denying him a more prompt trial.  State v. Dukes, 256 S.C. 218, 182
S.E.2d 286 at 288 (1971).  This appellate court must carefully consider the
length of delay, reason for delay, defendants assertion of a right to a
speedy trial and any prejudice to the defendant caused by the delay.  Barker
v. Wingo, 407 U.S. 514 (1972).  The appellant was held
for twenty-one months without a trial.  However, since his arrest, the
appellant has been appointed six attorneys and has released six attorneys. 
On the eve of a scheduled date for trial, one of the experts for the state
suffered a heart attack.  Another time, the trial was delayed to wait for a
psychiatric report on Adams to make certain he was
competent to stand trial.  Moreover, before the jury was struck in this
case, Adams made a motion for a continuance claiming that
he had not been able to put forth a meaningful defense.  Adams
failed to show that the state acted willfully and negligently or that he was
prejudiced.  The trial judge correctly ruled that there was no prejudice
caused by the delay in Adams trial.
II.      
IndictmentsFiling
Adams asserts that the indictments were not properly filed with the
Clerk of Court, in violation of Rule 3 of SCRCrimP rendering the Circuit Court
without jurisdiction to hear his case.  We disagree.
This argument is without
merit.  All three indictments were properly filed with the clerk of courts
office as is evidenced on the face of the documents.
III.    
Sufficiency of the Indictment
Adams argues that the Circuit Court lacked subject matter jurisdiction
because the kidnapping indictment did not sufficiently notify him of what he had
to meet at trial.  We disagree.
Cases combining the concept of the
sufficiency of an indictment with the concept of subject matter jurisdiction
were overruled by State v. Gentry, 363 S.C. 93, 105, 610 S.E.2d 494, 501
(2005).  The indictment is the charge of the state against the
defendant, the pleading by which he is informed of the fact, and the nature and
scope of the accusation.  Id. at 102, 610 S.E.2d at 499.  The Gentry court
explained:

 The indictment is a notice
 document. A challenge to the indictment on the ground of insufficiency must be
 made before the jury is sworn as provided by § 17-19-90. If the objection is
 timely made, the circuit court should judge the sufficiency of the indictment
 by determining whether (1) the offense is stated with sufficient certainty and
 particularity to enable the court to know what judgment to pronounce, and the
 defendant to know what he is called upon to answer and whether he may plead an
 acquittal or conviction thereon; and (2) whether it apprises the defendant of
 the elements of the offense that is intended to be charged.  In
 determining whether an indictment meets the sufficiency standard, the court
 must look at the indictment with a practical eye in view of all the
 surrounding circumstances.  Further, whether the indictment could be more
 definite or certain is irrelevant.

 Id. at 102-03, 610 S.E.2d at 500
(internal citations omitted).  
Upon viewing the indictment with a
practical eye, the indictment must provide Adams and the
court with sufficient certainty of the crime committed.  State v.
Reddick, 348 S.C.631, 560 S.E.2d 441 (Ct. App. 2002).  An indictment
is sufficient if the offense is stated with sufficient certainty and
particularity to enable the court to know what judgment to pronounce, the
defendant to know what he is called upon to answer, and if an acquittal or a
conviction thereon may be pleaded as a bar to any subsequent prosecution. 
State v. Towery, 300 S.C. 86, 386 S.E.2d 462 (1989).   
The indictment stated, That
Edmond Stanley Adams III, did in Richland County on or about August 17th,1998,
unlawfully seize, confine, inveigle, decoy, kidnap, abduct or carry away any
person to wit Victim by any means whatsoever without an authority of law. 
The indictment was clear upon its face.  When Adams
received this indictment he was made aware that he was being charged for his
illegal confinement of Victim on August 17, 1998.  As required, the
indictment contained the necessary elements of the offense charged and
adequately informed Adams as to what he had to meet at trial.  There was no challenge
to the indictment prior to the jury being sworn, and the indictment meets the
practical eye requirement.  Viewing the indictment with a practical eye
pursuant to § 17-19-90 and the Supreme Courts holding in Gentry, we
find that the trial court did not err in finding the indictment sufficient.
IV.     
Post-Trial Motions
Adams states
that he should have received a written order granting or denying his post-trial
motion(s).  We disagree.
Adams is
relying on Rule 29 SCRCrimP regarding this issue on appeal.  However, this
issue is without merit. Rule 29 SCRCrimP states:

 The time for appeal for all
 parties shall be stayed by a timely post trial motion and shall run from the
 receipt of written notice of entry of the order granting or denying such
 motion.

All of Adams
post-trial motions were denied after a hearing, and Rule 29 does not require a
separate written order.  Such a requirement would be unduly burdensome on
the courts.  We observe that Adams was the party who
filed the intent to appeal which transferred jurisdiction to this court.
 The trial court did not err by omitting written post-trial orders.
V.     
Search Warrant
Adams claims
that he was not properly served with a search warrant and thus the evidence
found in his house should have been suppressed.  We disagree.
The appellate court is bound by the
trial courts factual findings, including preliminary factual findings in
determining the admissibility of certain evidence in criminal cases, unless they
are clearly erroneous.  State v. Wilson, 345 S.C. 1, 5, 545 S.E.2d
827, 829 (2001).  The trial court held a pre-trial hearing on the validity
of the search warrant, and found the search warrant to be valid.  Adams
argued before, during and after trial that he was not served with a copy of the
search warrant.  This is in direct opposition to the pre-trial hearing
testimony of Officer Thomas Thomas who stated that he read the search warrant to Adams.
 Officer Thomas left the search warrant on the kitchen table at Adams
home while Adams was being transported to Richland County Detention Center. 
We conclude that the search warrant was properly executed and that the trial
court did not err by refusing to suppress evidence.    
This issue may not be preserved for
review because Adams did not object to the admission of the
photographs of his home based on the service of the search warrant.  See
State v. Tucker, 319 S.C. 425, 428, 462 S.E.2d 263, 265 (1995)
(mentioning a party cannot argue one ground below and then argue another ground
on appeal).  However, if preserved, the issue is without merit.
VI.     
Batson Issue
Adams asserts
that his rights were violated when the judge sat five of the jurors he
struck.  We disagree.
 The Equal Protection Clause
does not allow the State to challenge potential jurors solely on account of
their race or on the assumption that black jurors as a group will be unable
impartially to consider the States case against a black defendant.  Batson
v. Kentucky, 476 U.S. 79, 89 (1986).  Likewise, the Equal
Protection Clause prohibits a criminal defendant from engaging in purposeful
discrimination on grounds of race in the exercise of peremptory
challenges.  See generally Georgia v. McCollum,
505 U.S. 42 (1992).  Before the jury was chosen, the judge
explained to the state and to Adams that if a juror was
struck solely because of race or gender, that juror would automatically be
seated.  Both the state and Adams stated that they understood the judges instructions. 
After the state made the Batson motion, Adams gave
race neutral reasons for only five of his ten strikes.  By Adams own admission, five of the strikes were based purely on
discriminatory reasons.  State v. Ford, 334 S.C. 59, 512 S.E.2d 500
(1999).  State v. Smalls, 336 S.C. 301, 519 S.E.2d 793 (Ct. App.
1999).
Furthermore, Adams
did not object when the subsequent jurors were sat.  Adams
is therefore precluded from raising an issue on appeal that he failed to object
to during the procedure.  State v. Hurd, 325 S.C. 384, 480 S.E.2d 94
(Ct. App. 1996).  He is estopped from raising this issue because he failed
to object contemporaneously and on a specified ground.  No issue may be
raised for the first time on appeal, instead it must have been raised at trial
in order to preserve the issue for appeal.  State v. Nichols, 325
S.C. 111, 481 S.E.2d 118 (1997).  The trial judge correctly sat the jurors
in question.
VII.    
Juror #126
Adams argues that Juror #126 should have been removed.  We
disagree.
After the trial began, Juror #126
made it known to the court and to counsel that he did know one of the potential
witnesses in the case.  When asked originally if he knew an April Weber,
the Juror responded in the negative.  His reason for such is that he did
not know her by her last name.  The potential witness, who was not called
to testify in the trial, worked as a switchboard operator at the place where the
Juror was employed.  The Juror was employed at that business for twenty
years, whereas the potential witness had only worked there for a year. 
 

 The question of the impartiality
 of the juror is addressed to the discretion of the trial Judge . . . and the
 scope of inquiry on Voir dire is within the sound discretion of the Circuit
 Judge, . . . and he has the exclusive power to determine a jurors
 competency and a finding on such is not reviewable except for error of law . .
 . If the question of the indifference of a juror is a mere question of fact,
 it is not reviewable upon appeal unless the conclusion of the trial Judge is
 wholly unsupported by the evidence . . . If there is evidence, however,
 tending to support the finding of the jurors competency, there is no error
 of law.

State v. Johnson, 248 S.C.
153, 163-64, 149 S.E.2d 348, 353 (1966) (internal citations omitted).  The
trial judge asked the Juror whether or not his knowledge of the potential
witness would affect his ability to be a fair and impartial juror.  The
Juror answered in the negative, and stated that he would not have any difficulty
being fair or impartial.  By asking the juror if he would be prejudiced
towards Adams and upon hearing that no such prejudice
would occur, the trial judge properly sat the juror pursuant to his discretion
and in accordance with Johnson. 
Adams neglected to raise the issue of juror #126 at trial. 
Therefore it is not preserved for appellate review.  Hurd, 325 S.C.
384, 480 S.E.2d 94; Nichols, 325 S.C. 111, 481 S.E.2d 118.  The
trial court did not err in allowing Juror #126 to sit on the jury panel.
VIII.    Juror
Impartiality
Adams questions the impartiality of the jury on appeal. 
Post-trial, he informed the trial judge that he had sued the South Carolina
Department of Mental Health and that several of the jurors were employed by the
Department of Mental Health.  However, Adams heard the places of employment of all the jurors when they were
polled prior to trial.  Moreover, the jurors who worked for the Department
of Mental Health were struck and did not serve on the jury.  This argument
is without merit.
Adams states that there were major conflicts with the other
jurors.  However, he has failed to identify what these major conflicts
are.  Additionally, he did not object at trial; therefore, there is no
issue preserved for appeal.  State v. Williams, 303 S.C. 410, 401
S.E.2d 168 (1991).
IX.     
Closing Argument
Adams appeals on the grounds that the solicitors comments in her
closing argument were improper and that she showed inappropriate pictures. Adams
argues that he should be granted a mistrial based on the comments regarding the
Weber incident.  We disagree
Not every improper argument requires
reversal as long as it is not prejudicial to the defendant.  State v.
Cooper, 334 S.C. 540, 514 S.E.2d 584 (1999).  The trial judge is given
considerable discretion in considering the scope and appropriateness of the
closing argument of the solicitor.  State v. Durden, 264 S.C. 86,
212 S.E.2d 587 (1975).  The control of arguments is usually within the
sound discretion of the trial judge, and that discretion will not be questioned
unless there is evidence of clear abuse.  State v. Stroman, 281 S.C.
508, 514, 316 S.E.2d 395 (1984).  The trial judge did not err by not
declaring a mistrial. 
The Solicitor must stay within the
record and its reasonable inferences.  State v. Linder, 276 S.C.
304, 278 S.E.2d 335 (1981).  The judge warned Adams of opening the door to the Weber incident.  However,
on cross-examination of Officer Thomas, Adams insisted upon
asking Officer Thomas about the Weber case.  The court then gave the state
permission to question Officer Thomas regarding Weber, because Adams had opened the door.  Selective testimony about Weber
was heard during trial.
Curative instruction to disregard
incompetent evidence and not to consider it during deliberation is deemed to
have cured any alleged error in its admission.  State v. Kesley, 331
S.C. 50, 502 S.E.2d 63 (1998).  During the closing argument, the state
presented:  And we were limited to how much we could get into it, but is
before you now, ladies and gentlemen, as we know that on July the 4th,
1997, another young girl accused this man of the same thing.  Criminal
sexual conduct in the first degree and kidnapping.  Adams
objected, arguing he was not charged with criminal sexual conduct in the first
degree.  The State explained he was charged with such, and the trial court
said, [T]he jury will remember what evidence has been introduced and you will
make your decision based on those elements and not what either one of these
lawyers tell you.  The State was allowed to proceed.  The solicitor
referencing Adams house said, [h]is house where he
brutally raped and kidnapped another young woman.  Adams
objected again.  The trial court agreed the reference was improper, and
reminded the jury of his previous limiting instruction making it clear that he
would again give a limiting instruction in the jury charge.  
Assuming error by the Solicitor, the
trial court ruled with Adams and gave a curative
instruction.  Such an instruction is deemed to have cured the alleged
error.  In light of the entire record, the instruction adequately cured any
improper arguments.  The record reveals overwhelming evidence of Adams
guilt.  Furthermore, because Adams fails to
demonstrate both error and prejudice, the trial court did not abuse its
discretion in denying the motion for mistrial.
 Adams
argues that the State showed pictures of Weber during the closing argument that
were not introduced into evidence.  Upon examination of the record based on
the cite that Adams provided, there were no pictures
introduced in the closing argument. 
We conclude that any error was
harmless.  Whether an error is harmless depends on the circumstances of
the particular case.  No definite rule of law governs this finding; rather,
the materiality and prejudicial character of the error must be determined from
its relationship to the entire case.  State v. Mitchell, 286 S.C.
572, 573 336 S.E.2d 150, 151 (1985).  Abundant evidence in the record
points to Adams guilt, and, thus, any defects in the States closing
argument would not have affected the outcome of the trial.  Id.
(Error is harmless when it could not reasonably have affected the result
of the trial.) (quoting State v. Key, 256 S.C. 90, 93-94, 180
S.E.2d 888, 890 (1971)).
CONCLUSION
Accordingly, Adams
convictions and sentences are
AFFIRMED.
ANDERSON, HUFF and WILLIAMS, JJ.,
concur    

[1] We decide this case without oral argument pursuant to Rule 215,
SCACR.